This case arises from the arrest of an activist on a public sidewalk in Skid Row when he protested the massing of a police presence. The city, the police department, was enforcing a policy of the city regarding public assemblies by applying penal code section 403, which regulates disruption of public meetings in the state of California other than meetings that are religious or political in nature. This statute is almost 150 years old and has been construed once by the California Supreme Court, which recognized that this statute was significantly overbroad. At the time that that argument was made in 1970, the court decided in 1970, a vagueness argument was also made. But the California Supreme Court did not reach the vagueness argument because reaching overbreath and narrowing the statute through a ruling on the overbreath claim was sufficient for the court to reverse the convictions of the activist in that instance. The court did not consider, not only did it not consider the vagueness argument we now make, but it did not consider the First Amendment equal protection argument. And it could not have considered that argument because First Amendment jurisprudence had not recognized that argument until two years later when the United States Supreme Court decided, Police Department of Chicago v. Mosley. Under any analysis, Penal Code 403 is a content-based regulation. It purports to simply regulate disruption of public meetings, but it carves out two exceptions, and it identifies those exceptions based on the speech of the target. So those speaking about matters of public concern who also happen to be over the age of 18, eligible to vote, electors, they are entitled to anybody protesting their activities can engage in a wide variety of expressive activity up to threats, intimidation, and unlawful violence. That same range of activity is not permitted for the entire group of public meetings, the entire category of public meetings that don't fall into the election code exception or that don't fall into an exception for disturbance of religious meetings that take place in a building that is also tax exempt. The exceptions to the statute render it unconstitutional and content-based, but they do a second thing. They give credence to the argument that the government's justification for regulating the speech in question or regulating the disruption is not itself credible because if it were, if that government interest were legitimate, significant, if it were valid, then it would apply as well to all the other speech and all the other expressive activity that is prohibited unless it is electors. So the district court below erred in not finding that this was a content-based statute, and even if you view this as a content-neutral statute, it still fails constitutional scrutiny. It is measured by an exacting scrutiny as compared to a strict scrutiny for a content-based statute, but that exacting scrutiny requires that there be time, place, and manner regulations, and this court held in Hopper v. Pascoe that in order for there to be valid time, place, and manner regulations in a traditional public forum, and this is a public sidewalk, in order for those to be valid, they have to be according to objective criteria and set out in advance. That was not the case here. The criteria were announced to the extent that there were any by the captain during the course of the protest who said no air horns, no bull horns, no noisemakers. There were none. And then the lieutenant who added to this her standards, which were don't be too loud, don't follow too closely. Those are not objective standards that anyone would understand. In addition, the... How is it not a sufficiently objective standard to ask whether in fact there was a disruption of a meeting, assuming for a moment the statute doesn't suffer from the other infirmities you talked about? Disrupting a meeting, why isn't that an objective standard? Discerning what in a particular circumstance, there are lots of ways you could accomplish the disruption, but the disruption itself seems to me to be a pretty objective standard. Well, the disruption of the meeting, Your Honor, depends upon where the meeting is, how it takes place, what it is. So, for example, if it is a meeting of a council in the chambers, then there is one standard that applies. This court said in Gathright v. Portland that the standard is entirely different when you have an unpermitted event open to the public in a public forum. In this instance, you don't even have... You have a moving target. You have a group of people, elected officials and public officials and business people that they brought along, who are walking down a public sidewalk. In that situation, what the California Supreme Court said in Ray K. is that in that kind of a situation, you have to expect that people are going to engage in very vigorous objections to that. And the words that the California Supreme Court used to describe that were that people will shout, they will push,  And it may not all be courteous or polite, but that was the standard that the California Supreme Court said applies in a traditional public forum such as this where you have an open-air group. If anyone charged with going out to protest wants to know what are the limits on their activity in this particular forum, in this particular circumstance, they're charged with having knowledge of the case law, the statute, any applications, any legislative intent, all of that. Even if they knew all of that, in this instance, they would come away with the instruction in Ray K. that they could engage in loud discussion, shouting, pushing, shoving, and that means that that's the notice they would have. So for the city then to decide through the police that they would apply a different standard than the one that somebody reading in Ray K. would think would define the scope of their activity, means that this law is unconstitutional. Well, it sounds like more an argument that Mr. White is innocent of the charge than that the statute itself is defective. Well, no, we've made two arguments, Your Honor. Mr. White is innocent of the charge. Mr. White did nothing that day except at the end of the march, when he saw the police massing, he walked over to the corner, faced the police, he had no idea where anybody else was around him, and simply said, we are not resisting, it's our First Amendment right. And for that, he was arrested. And he has the opportunity to prove, in fact, that's what happened and be acquitted of the charge. But the problem in this instance, Your Honor, is that if the city, if 403 by its plain terms, and if the city's application of it, allows it to arrest people such as Mr. White, and allows the city to threaten the arrest of other people, as they did here, then that criminal statute fails to give adequate notice, provides unfettered discretion to the police. We have a lot of people who get arrested and they wind up being acquitted or having charges dismissed or having a prosecutor decide not to pursue the charge because a closer look reveals that, in fact, the prosecutor can't prove a violation of the statute. That doesn't mean the statute's unconstitutional. Why is it here? I mean, if this were a repeatedly invoked statute and you could demonstrate a persistent pattern of excessive application or so forth, you might justify a declaratory injunctive relief with regard to the enforcement pattern. But why does that make the statute itself properly confined by Kaye and other decisions unconstitutional? Well, to begin with, Your Honor, the statute is not properly confined by Kaye. Kaye only dealt with one question, the overbread question. California Supreme Court may have more opportunities to interpret it. As you said, there were some issues that it did not have occasion to reach then. That doesn't mean those occasions can't be presented to it in the future. Well, that is true, Your Honor, but it's been 43 years, and the California Supreme Court and the legislature have not addressed it. See, but that doesn't really help because it suggests there's not really a problem, that there's not widespread enforcement of this provision in a way that offends people's rights such that it gets challenged. Well, I don't believe that that's what it says, Your Honor. I think that that is a leap that isn't supported in this instance. Is there any evidence of widespread enforcement of this statute in some abusive fashion? In an abusive fashion? Well, certainly within the city of Los Angeles in this case. See, this case isn't widespread. I'm trying to figure out if this is just one episode, and it turns out that Mr. White's innocent and that other people aren't charged, I'm not sure exactly what the problem is that makes the statute as a whole unconstitutional. Well, it's not one episode, Your Honor. Mr. White's arrest was the only arrest in this instance. However, as the record clearly indicates, the city had set out to make arrests that day. The city threatened other arrests. The city threatened arrests. According to the declaration filed by Mr. Conn, the city threatened arrests in subsequent walks as well. But the issue, Your Honor, this court has never said that when it came to a statute that directly restricted First Amendment activity and imposed a criminal penalty for an alleged violation of that law, that people had to wait for repeated enforcements. In fact, it is the only area where pre-enforcement challenges are routinely allowed because of the damage and the chilling effect of First Amendment rights by the threat of enforcement. So Mr. White and the others, Mr. Conn, don't have to wait for the city to decide to arrest them again, particularly if in response to the city's threats, they deter their own conduct. They restrain the exercise of their First Amendment activity. Let's move on. You've had a lot of issues for 15 minutes, and maybe we'll even extend both sides' time. But to get past the first point that Judge Clifton is raising, and let's assume that we understand the question of whether the statutes are constitutional or unconstitutional, do you still have a claim here that the city of Los Angeles is enforcing the statute in an unconstitutional manner and that there's a basis for an injunction against the city for the manner in which it enforces it? Even if you lose on the question of whether the statute's constitutional, would that be the next issue? Yes, that would be the next issue. I mean, I think that we would be entitled to that relief because the city has announced its intent to enforce this, has applied it, has arrested at least one person. The evidence in this case is that other people have curtailed their conduct because of the arrest of Mr. White. So at a minimum, the as-applied challenge would go forward in this instance, and the city should be enjoined from applying this statute as they did in the case of Mr. White. I said, Clipson said, was that one arrest of one person, and there are lots of times, I don't want to exaggerate, the LAPD may have arrested somebody and then either dropped the charge, as I gather happened with Mr. White, or just made an error or violated the law in respect to investigating one person. In what manner are you basing this requested injunction on conduct that causes you to believe that this is more than one arrest? Well, I think that the important thing here is that the city has not, in any of its filings, has not indicated that it does not intend to apply this statute again. The city agreed at the outset that it would not apply 403 pending a judicial determination of the lawfulness of its actions. So the city, if the court doesn't rule on it, the city is free then to go back to enforcing 403. But the only reason that the city did not do any further arrests was because they agreed, they stipulated that they would not enforce 403 until there was a judicial determination. There is the voluntary cessation of enforcement in this instance does not eliminate the city's, or in any way eviscerate the city's intent to go forward and use this as a tool to arrest people who engage in these kinds of protest activities. Third question, or maybe second, I can't judge. Clifton is one of my questions. Third question is what disputes of fact do you see in the record that would preclude summary judgment for the city? Well, I think that among the disputed facts are what, in particular with regard to Mr. White, the court resolved all the issues in favor of the city and found that Mr. White had been given adequate warnings, that Mr. White was shouting a foot from the back of the head of someone. When you say these things, are these the things where the record shows disputed facts? Yes, Your Honor. And these are the specific things that the district court ruled on. The district court said with respect to, I believe it's Exhibit 13C, which is a still from one of the videos, and it shows Mr. White standing on the sidewalk. And as the video would show, that is the point at which Mr. White is saying, is in the excerpt of record at Exhibit Z, page 33 and page 34. And that was critical, particularly in terms of how the court found that there was no disputed fact about the propriety of the arrest of Mr. White. The court adopted the city's version of facts, that Mr. White was yelling into the back of the head of one of the people involved in the walk, the public official's walk, and that he was just a foot away from them. 13C and 13D show Mr. White facing the police, no one around him. There is a gentleman who appears to be walking across the street and up to the sidewalk, but he's not identified as somebody with the safety walk. There's no one from the safety walk visible. And, in fact, in her deposition, Lieutenant Paulson conceded that from where she was standing, just a few feet from Mr. White who was facing her, she could not see anybody in the safety walk anymore, any of the public officials or the elected officials who were participating in that. So the notion that Mr. White had engaged in this conduct and was yelling into the back of someone's head is simply not correct in terms of the evidence. So why wasn't this question better raised in the context of a criminal prosecution where specific facts can be ascertained as to what happened? Part of my problem here is that there ultimately was no criminal prosecution. So I'm not sure what it is we're to say is unconstitutional as applied because, in the end, the statute wasn't applied. Well, the statute wasn't applied because, you know, fortunately or unfortunately for my client, I'm extremely aggressive about attempting to get all those charges dismissed before they're filed and before there's a criminal prosecution. And that's to your client's benefit. No quarrel with that. The problem is for us, we don't have evidence of a recurring pattern of police misapplication. We have one particular episode where you've got a pretty strong case. There may have been a misapplication. But are we supposed to rule every time that somebody is arrested but then not charged, that that goes to the constitutionality of the statute as applied in that instance? No, Your Honor. And I'm not asking the court to do that, particularly because in this instance, you have several pieces of evidence of the city's intent that allow you to avoid that issue and that problem. You have the city announcing that if it couldn't arrest people pursuant to 403, it was going to arrest them pursuant to Penal Code 415, public disorder, until they could get a judicial determination of whether Penal Code 403 could be applied in this instance. So you have the city's stated intent to continue to enforce it. In this instance, I'm not sure. I mean, frankly, I'm somewhat sympathetic to the argument you're making, but I'm not sure what the decree would say in terms of what does it mean to be as applied, in what context, on what particular set of facts. And that starts to sound to me more like, well, the judge deciding whether this criminal prosecution, the facts established, which are somewhat disputed here, the facts established warrant application of the statute. And then after that, you get to the bigger First Amendment-type questions. Well, except that the problem in this instance with the prosecution is that the statute was applied in this manner, could be applied in this manner, because the statute is unconstitutional. So it gives unfettered discretion to police. That is the hallmark of an unconstitutional criminal statute, particularly one that penalizes First Amendment activity. Your Honor, I don't know of many cases where, you know, Inmate K was the first prosecution of that statute. I mean, this is a moribund statute that has been used very infrequently, and certainly it arose in the context of convictions, but it happens, I think, quite frequently that, as I said before, you know, it is the one area where the courts permit pre-enforcement challenges, where a criminal statute is going to limit First Amendment activity. There is no case that I'm aware of that says the court should avoid ruling on the constitutionality of a statute that has been applied, that the city says it will apply again until the city then applies it again, because, you know, it sort of goes round. And is it two times in ten years, or three times in one year? I mean, I just think that it fits within the classic First Amendment jurisprudence of this court and the Supreme Court. You know, in Shuttlesworth, for example, it was an obstructing the sidewalk statute that was applied to Reverend Shuttlesworth and others. The court didn't ask how many times that statute had been applied. They looked at how that statute was applied to prosecute Reverend Shuttlesworth when he refused to leave the sidewalk when ordered by the police. There is no discussion in any of the cases at any level through the state cases, and it was a state criminal prosecution, and I believe ultimately – I don't believe Reverend Shuttlesworth – I'm sorry – willfully disrupt the meeting. I mean, the lieutenant talks about how the walk had gone on, and he says he wasn't a foot away from them and so forth. So it sets up – and I don't mean this in any facetious manner, but kind of a straw man for us to say a statute applied beyond its terms is unconstitutional. Somebody charged who's not guilty of the charged conduct has a right to say the statute's unconstitutional because I'm not guilty. I don't see a productive decree or injunction resulting from a set of facts which on its face suggests he's not guilty of the charge. What we have here is not an unconstitutional statute. What we have here is a bad arrest because he wasn't guilty. So what kind of decree do we come up with? Judge Walter thought he was guilty because he thought that the statute absolutely reached his conduct. So clearly it is not a situation where there was one bad arrest and the district court said, yeah, you know, it shouldn't be applied that way. In fact, the district court said it should be applied exactly as it was applied. The city said we want to apply it exactly as it was applied. I understand what the court is saying, but I think that the evidence in this instance is irrefutable that the city intends and intended to continue to apply that statute in the same way. And from my client's point of view, it is necessary and important for the court to rule on a statute that is 150 years old, written long before First Amendment jurisprudence developed, unconstitutionally vague, overbroad, content-based. You know, it is a walking example of every First Amendment. The statute is actually parallel with the First Amendment in a certain respect because it is intending to protect the rights of other people to do what they want to do. And I don't think we can lose sight of that. This is not a statute that says you can't protest. This is not a statute that says you can't occupy the park, you can't use the sidewalks, so on and so forth. And it's tricky in the context when you're dealing with a mobile meeting because the statute wasn't written, and I suspect, well, it didn't get applied very much in any circumstance, but the people who drafted it heaven knows how many years ago weren't thinking of a skid row walk. They were thinking of a meeting in a place. And they were more concerned about people determined to keep the people at that meeting from doing what they want to do. And those people have First Amendment rights, too. So this isn't the collision that many of the First Amendment cases present. Now, these factual circumstances where you've got a movable feast, I concede it's tricky, and I'm not sure exactly what the statute is supposed to mean there. And we have a whole array of issues we're going to take up with the city, I'm sure, with regard to the vagueness and specificity. But you're asking us to come up with what amounts to a rule of law or decree, and I've got to tell you I'm having a hard time drafting what that rule of law would be. I think there's an easy issue of rule of law here, Your Honor, because there is a collision with the First Amendment. And there is a collision with the First Amendment because if Mr. White – let's say for argument's sake that the city was right that Mr. White's conduct violated this ordinance. If Mr. White had done the same thing where there was a meeting of electors who were engaged in discussing a matter of public concern, his conduct wouldn't be reached by the statute under any circumstance because he didn't amount to threats, intimidation, or unlawful violence. That is the fundamental problem with this statute, the decree. Larry, you're asking just for a simple declaration that the statute is unconstitutional. Yes. I think Judge Christin was asking, if I understand it, and I would have the same question, which is, assuming that it is constitutional, what do we do about your request that we issue an injunction that the city not do something based on the fact that one person was arrested, maybe improperly? Where do we go? That's what I asked you before. Do you have other threats by the city to interpret the statute in a manner with which you disagree, with which we can say based on the city's saying we're going to arrest people who do X, is there a basis for an injunction to say not just Mr. White was arrested and then it was dropped, but is there something more on which we could say here is how the city threatens to enforce this statute, and that's why we need an injunction to prevent them from doing this. I understand the problem, Your Honor, and I think it's somewhat circular here, because my clients restrained their activities after Mr. White's arrest. They went out, but they didn't do what they had done before, because they were threatened by arrest. So was there another threat of a particular arrest after that? I mean, there was. Well, what is the evidence? You know, I don't recall everything I read in this record, but what did the police say they would do? When did they say they would arrest people? I think there were meetings with the National Lawyers Guild, as I recall, in which the police said, here's what we're going to do. Is there some evidence that they said they were going to do something that you think is unconstitutional? Well, you know, one of the difficulties here is that after the briefing was completed in this case, the city did initiate a criminal prosecution against one of the other people based on their participation in the walks, their opposition to the walks. That did go to trial, and the person was acquitted. They were not charged with PC 403, because the city had agreed that they would not charge that at this point. But that's not in the record, Your Honor. And that criminal trial took place mid-year last year, based on this particular walk. In fact, it was one of the people that was targeted in the roll call meeting before the day on which Mr. White was arrested. One of the lead people, and that is in the record, that was targeted was Deborah Burton, who was one of the organizers. She was criminally prosecuted. They filed charges in, I would say, probably in late 2012, based on her participation in this. And, you know, she went to trial on five counts. But she won. But, Your Honor, the whole notion of the First Amendment and engaging in process activity is that the government doesn't get to enforce bad laws or enforce laws badly, and you have to go to court each time. Well, that's the second part now. Right. So enforce laws badly. If we have a recurring pattern, yes, courts do intervene. But what you've given to us, I mean, we have now this extra record, but frankly, I appreciate your giving it to us. Okay, we have two episodes to deal with. Is that a pattern? Is that enough to justify injunctive relief because there's imminent harm? I mean, there's – it's a hard – injunctions are not easy to craft. And I'm struggling with the question of what an applied – as applied injunction here would look like, other than to say don't charge somebody with conduct that doesn't make them guilty under the terms of the statute. That's not useful. Well, it's a little like the Kaye case, which I'm not so sure about, but it's still a law. I don't even know what that means or why that – how that cures all the ambiguities. It seems to me it just gives you a more complicated set of ambiguities. But that supports what Judge Kristen said. It's very difficult with this type of a statute to explain what you can do and what you can't. And it says, well, you look at the customs. Who knows what those customs are? But the question is whether we could do something to explain what is permissible and what isn't, assuming we get the statute as constitutional, and whether we can do that on the basis of what the police conduct during this one episode. And I don't minimize it when I say one episode. I mean, did the way the police enforce this state law, does it justify an injunction that's like Kaye or whatever it is like, setting forth what is right or wrong under the statute, how the police may behave? If we were to try to do what the California Supreme Court did in Kaye and try to make it more specific in terms of this particular law and these kinds of demonstrations, A, what would we say, and B, do we have enough basis to justify that type of action? Well, Your Honor, I think that in this particular instance, Your Honor has mentioned the ambiguities and the difficulties in Kaye and how you lay all of this out, and I'm not sure that that is what the court should aim to do here. Because in part, or in significant part, that would involve the court assessing values for terms that are in this statute. And ordinarily, when a federal court looks at the constitutionality of a state statute, particularly a criminal statute in California, the courts aren't allowed to take terms out, import terms that might clarify it, none of that is permitted. And in California in particular, California, all crimes in California are statutory. There are no common law crimes in California. So no court can basically rewrite the statute because that is the job of the legislature in California. And we're not asking the court. Well, we could certify this question to the California Supreme Court. Well, it's going to be like the Jones case in 12 years, but I think that my position with that case, but I think that certification would not be proper in this instance. And the reason I think that certification would not be proper is that certification is only appropriate where a statute is fairly susceptible to a narrowing construction. And that's the rule of the Supreme Court, I believe, in the Stenberg case, and 530 U.S. at 945. And we continue to maintain that this is a statute that is not capable of a narrowing construction, if for no other reason than because of the two exceptions to this statute that differentiate the level of criminality based on the content of speech for the speaker. And from appellant's perspective, I think it is sufficient for the court to say it is an unconstitutional statute and that the California legislature needs to go back and look at it. It is so riddled with definitional vagueness problems, with unfettered discretion, with content-based issues. If this court doesn't address those, then this statute stands. And it stands as a chill to anyone who wants to go out and engage in expressive activity at a public meeting. And the court knows, certainly, I believe it's the Kind case, Kind v. Santa Monica, that involved, or I guess it's Norse, that involved a Penal Code 403 violation against the city of Santa Cruz, where Robert Norse, an homeless activist, used a Nazi salute during the time of the meeting. And, you know, Mr. Norseman, it only happened once. And this court had no problem saying that that was an overbroad law that penalized protected expressive activity and that required actual disruption. But there was no argument there that, in fact, the ordinance or whatever was being applied to exactly that conduct. And in this case, it's gotten much more difficult because, as you've noted, there's a dispute of facts as to what actually occurred. Did, in fact, Mr. White disrupt the meeting? The city, I doubt, is going to take the position that this statute can properly be applied to somebody who's not, in fact, willfully disrupting a meeting, which is what your client is contending happened. And so we don't fit very well in trying to define. I mean, if we assume for a moment an actor who is willfully disrupting a meeting, something that falls within the statute, that's the question we can speak to. Does an application of the statute by its terms result in an unconstitutional application? And I haven't seen that case clearly apparent in front of us because your client's telling us I didn't do that. So, I don't know that I'm saying anything different than we've said, but you understand the quandary I'm trying to figure out, how it is we would express. I understand you've got arguments, and there may be a basis for us to say that on the broader arguments, the statute itself is unconstitutional. But when we get down to the particulars and you cite the Nazi salute, well, it's easier for us to say, in that case, the ordinance is applied to that, the city takes the position it's applied to that, it can't properly be applied to that. And we don't have that here with regard to your client's conduct because there's a very different set of descriptions as to what happened. Did your client, in fact, disrupt a meeting? And if you're going to say no and they don't charge him in the end because apparently he didn't, well, okay, we can say the statute doesn't apply to conduct it doesn't cover, but that's not the injunction you're seeking. But even if my client did everything the district court said he did, that he yelled a foot away from the back of the head of somebody in that meeting, it would still not be unlawful. It would absolutely not be unlawful. So we're moving away from the as applied challenge, well, at least one level, because you're arguing that, in fact, you can disrupt, you can willfully disrupt a public meeting. No, I'm not arguing that you can willfully disrupt a public meeting, Your Honor. What I'm arguing here is that you cannot have different standards for disruption, for different types of public meetings. Well, that's your first argument. Right. But what if you get past that and you lose on that question? And it says it's not unconstitutional because of that. It may be. I don't know because I haven't thought this through. I mean, it may be that we're in a better position to answer the question if instead of assembly judgment there's a trial and we know what the facts are and what kind of a specific injunction you're asking for or not asking for after the facts are established. I mean, that's just looking ahead of whatever the fact finding may be if we reverse assembly judgment. And I'm not sure I can anticipate all of that, you know, whether the evidence shows that other people were deterred either before or after the arrest of Mr. White, whether you can establish what the city policy or the police department policy, whoever's policy it is about when they do and don't arrest people and whether those facts are consistent with somebody's view of the law. I'm not sure that the city and the plaintiffs agree at all on what can be done, what constitutes disruption. I don't disagree with that, Your Honor. But I think the question of what constitutes disruption is for the legislature to decide based on a proper statute and not this statute. Because what the legislature has said here is that the same thing that Mr. White is accused of is not disruption, as disruption of this walking thing on a public sidewalk, is not disruption, not unlawful disruption. I have the same problem that Judge Crouften has with injunctions. I have them with statutes. I mean, how do you ever write in a statute what is really permitted and what isn't? And particularly under these moving kinds of meetings, you know, don't ask anybody to declare the Antitrust Act unconstitutional because it's vague. It's a couple of sentences, and we've got volumes and volumes of what does it really mean. And this type of statute, to me, is necessarily vague, always will be. I mean, you can write the kind of decision the Supreme Court of California wrote, and to me the statute's just as vague as it was before. As it's vague with the legislature, I mean, I don't think this body is going to write something that tells you what you can do and what you can't that will meet the Constitution. Good luck. But I don't disagree with that, Your Honor, but that doesn't mean that a law that is inherently and fatally unconstitutional should remain on the books as a tool for law enforcement to use. I can't think of a rationale for why political speech in... Okay, well, if you win on that argument because you have those two exceptions, it's unconstitutional. Then it's all very simple. What we've been talking about is if you don't win on that argument, where are we? But I think we'll give you two minutes for rebuttal because you're now over time. Thank you, Your Honor. I hope you're getting paid by the minute. We worked you out. Yeah, you know, well, getting paid is another issue. We understand. Good afternoon, Your Honors. Kim Erickson, Deputy City Attorney on behalf of Appellee City of Los Angeles. I want to first address what Appellants had stated to the Court regarding a woman who was prosecuted last year, Deborah Burton. Appellants stated that she was prosecuted in criminal court last year for her participation in the walk, and that was... The impression that that gives is not true, Your Honors. She was not prosecuted for any type of speech or anything that she said at the meeting. What she was, during her protest, what she was prosecuted for was assault and battery. For her actions in putting a bullhorn and an air horn up to Estela Lopez, who was one of the organizers of the Skid Row walk. And Estela Lopez, in SDR, Supplemental Excerpts of Records Number 8 and 9, starts, she explains what happened that day. So the air horn, excuse me, and the bullhorn were... She was acquitted of this, right? Correct, because there was an issue... that Estela Lopez said happened, is she was acquitted. Well, there was an issue, Your Honors, about the jury not understanding how a sound could actually be a battery. There was some case law from, you know, from... Lots of juries may not understand that when they acquit, that's what happens. But anyway, let's not spend too much time on... Yes, but I just wanted the Court to understand... She wasn't even charged under the law that we're talking about today. Correct. She was charged under a battery for blowing, for putting an air horn in Ms. Lopez's ear, which she now has tinnitus for. So it wasn't based on any protest, due to her protest activity. Well, isn't that one of the things that we've been talking about in this case, is putting an air horn at some kind of a device too close to somebody's ear? I'm sorry, Your Honor? Isn't that what the theory is about this case, too? Yes, Your Honor. It's about the noise and the excessive ruckus that the L.A. CAN members and Pete White exhibited at these meetings. And if I can just go back. Basically, this case is very unique in the sense that it involves the balancing of First Amendment rights between two groups. One is the L.A. CAN group with Pete White, who is the co-director and founder. And the other is the Skid Row walk. And this did not have to occur on July 6, 2011. The L.A. Police Department had tried for months to work with L.A. CAN, with Pete White, with Becky Dennison. They had tried since March to work with this group to allow the protest of L.A. CAN to continue. However, Lieutenant Paulson also wanted to preserve the First Amendment rights of the Skid Row walk attendees by allowing them to go on this walk to discuss the conditions of Skid Row and be able to communicate with each other. However, L.A. CAN disregarded and did not have a conversation with the L.A. Police Department as to where the reasonable bounds of their protest. Lieutenant Paulson, she was caught twice on video on July 6, 2011, stating to the legal observers with L.A. CAN, I want you to have your protest. I am here to facilitate that for you. I want to do that. Pete White was standing a foot behind videotaping the entire thing, would not have a conversation with the police. She was trying to work with these protesters so they could also protest this event. But she also had to preserve the integrity of the First Amendment rights of the Skid Row walk attendees who had a right to be peaceably assembled on the public sidewalk of Skid Row as well. So the L.A. CAN members, they believed that their rights were tantamount to the Skid Row walk attendees, and they didn't care. They did not want to have this conversation with the police. If they had just spoken with the police and just... I thought they did meet with the police observers from the National Lawyers Guild that held a meeting with the police at which the police discussed their views of this project. Was there a disagreement at the meeting as to what could be done and what couldn't under the law? And Your Honor, is Your Honor talking about prior to the July 6th walk or during the July 6th walk? I don't know. Both, I thought. Well, you know, the walk had gone on since 2005 without any problems or issues. And starting in March of 2011, that's when L.A. CAN began to protest vigorously. The city doesn't dispute that they have every right to protest. It's just the manner in which they were doing that. So starting in March of 2011, Lieutenant Paulson and the police department were trying... realized that the L.A. CAN was going to protest these events. Starting in April, Lieutenant Paulson went to the Skid Row walk, and she tried to speak with the L.A. CAN members. No one would speak to her. No one wanted any involvement. No one wanted some L.A. CAN to speak with the police to see how the police could facilitate, despite... Well, that's not the meeting I was thinking of, whatever it is. I just remember reading in the materials. Yes, Your Honor, and on July 6th, so this had been going on for months. On July 6th, the fifth month of these protests, there's probably been discussion about whether or not they could use air horns and how loud they could be. Perhaps if you could address that part of the meeting, maybe that would clarify it for us. Okay, so on July 6th, Lieutenant Paulson had met with the legal observers or legal advisors for L.A. CAN, because L.A. CAN would be Pete White and Becky Dennis, and the two directors would not meet with the police. So Lieutenant Paulson gave two talks to the legal advisors twice that day. The first in which Captain Chamberlain as well, Captain Chamberlain and Lieutenant Paulson met with the legal advisors and said, we can't be having this type of excessive noise. And Captain Chamberlain did mention air horns. However, there were no air horns that day, but there was a bullhorn, there were drums. And what the L.A. CAN members and Pete White would do is they would integrate themselves among the walk attendees, they would crowd them off the sidewalk, and they would just be integrated into their group, and as they were trying to stop at a location and speak, the drums would be banging, the bullhorn going, and on the bullhorn a woman would say, we need to scare them out of here, they're not welcome here, they should not be here. And this was constantly occurring right on the backs of these Skid Row walk attendees while they were trying to conduct a meeting right on the sidewalk. So Lieutenant Paulson pulled the legal advisors over and stated to them, we can't have this. And, you know, I want them to have their meeting and I want you to have your protest. But I can't have, the way it is now, I can't have the Skid Row walk attendees being integrated in with the L.A. CAN protesters. They can't conduct their meeting, or they can't communicate. And she said, Lieutenant Paulson said, during the first warning that was given on video, they have to be able to communicate if their meeting is disrupted, and they can't do that, and they've tried repeatedly to move away from the noise so they can facilitate their meeting. That's when we cross the threshold. I can't have that. She tells them, you guys can march on your march, I can facilitate that for you, it's not a problem, but if it gets to the point where it's disturbing a meeting, just like we wouldn't let anyone do that to you, we can't let anyone do it to them. So that was the first warning that she gave. Pete White was standing right behind, captured this on video. A short time later, there was no big change in behavior whatsoever. The L.A. CAN protesters continued to pursue and stalk these Skid Row walk attendees, still integrated themselves, still used the bullhorn, still used the drums. No behavior had changed since that point. How much of this does the other side, L.A. CAN, agree with your version of the facts? Well, Your Honor, I'm sure they don't agree with those versions, but the... Isn't that a matter for trial rather than summary judgment, if there's a disagreement over what happened? The evidence shows that the city's facts are correct. I mean, it's telling that appellants submitted only still photos to show Pete White's location. That's all they submitted. I believe they submitted a DVD, but the city also submitted the DVD. And you can't really tell from either the DVD exactly what happened where, when. It can be confusing. I understand. But does that not create genuine issues with the material facts? Well, no, not as far as Pete White's conduct that day, as to why he was arrested. If the videos, anyone who would look at those videos, in supplemental excerpts of Record 50, the city has provided five videos. And in those videos, and those were actually videos taken by Pete White and one of the L.A. CAN members. It's interesting how appellants did not submit those into evidence, because it actually showed that Pete White's behavior that day, as well as the L.A. CAN members. And it shows how they were integrated among them, how the noise level was excessive, and how Estella Lopez would throw up her arms and hold her hands over her ears because she could not communicate, and how other Skid Row walk attendees would turn around and look and crouch over if they're trying to speak. You could see how they could not communicate. And you can see all those on those videos. And you capture on the videos the warnings. So Pete White and the L.A. CAN protesters knew exactly, or at least Pete White and the legal observers knew exactly, what behavior Lieutenant Paulson needed them to modify. But it never, all those warnings went unheeded. There was never any change in behavior. And so, as far as the evidence goes, and when watching those videos, there's no undisputed fact. Does it matter what the facts are if, on its face, this statute is vague? Well, Your Honor, the city would argue that it's not vague. And it does give a person a reasonable and ordinary intelligence. After it was narrowed in K, it does give that person notice of what they see. Let me back up because I don't think you exactly answered my question. So my question was, do the facts even matter for the constitutional, the facial challenge to the statute? No, Your Honor. So even if we find that there are genuine issues of material fact, with respect to whether there was a disruption or what conduct Mr. White was arrested for on that day and how that statute was enforced against him, the constitutionality, the facial constitutional challenge is purely a legal issue? Correct. Okay. Correct. However, just if I could go back to the as-applied challenge, because I know that the appellant spent quite a bit of time on that, and then I can address the facial challenge 403. But the video, appellants talk about this 13A and 13B photograph, and it's just a snippet, one snippet of just a second in time. So it's completely, it doesn't give the full story as to what occurred that day. And if I would like to direct the court's attention to those five videos on SDR 50, that would show that Lieutenant Paulson gave a second warning, in which she talked to the legal observers again and told them, I can't have this, arrests are going to start being made. And this was the first time in five months of this harassing and aggressive noise and ruckus, loud and ruckus behavior. This is the first time in five months that Lieutenant Paulson had actually made the arrest. And she told them during her second warning, I'm getting real close here. I'm getting real close. An arrest is going to be made. And I know earlier that day, Lieutenant Paulson had a briefing in which she addressed, you know, the police officers and said, talked about the walk that was going to occur that night. And she distributed some photographs of LA CAD members who had been previously very aggressive. Now, Pete White's photograph was not in there. And, you know, she just wanted them to be aware of who they should be watching out for. Now, so that day, after the second warning, she said, I'm getting real close here to making an arrest. You can hear on the video, there's a, on SER 50, July CCEA walk. And Becky Dennison goes up and talks to Pete White and says, you know, I'm concerned here. They're starting, they're going to make an arrest. And he talks about disbursement. And then he said, okay, bring them down. And as soon as he said bring them down, the crowd was quiet. Now, that's the problem here. There is not, it shouldn't have been an all or nothing approach. They didn't need to be quiet. They could still have protested. So the fact that they were quiet, that doesn't, that shows that if they had actually had a conversation, had a dialogue with the police, they wouldn't have had to be quiet for that part of the time. Now, they were quiet and they were marching. And then as the Skid Row walk attendees crossed the street, Pete White started yelling across the street to the police officers that we are not resisting, this is our First Amendment right. For two minutes, he yelled that across the street to the police. They ignored him. They didn't have any problem with that. There was not a problem until he came up and crossed the street. And he was directly behind the Skid Row walk attendees. And this is shown on SER 50, Project 2, movie 8. And it shows his arrest. And it shows where he was. And it shows that Estella Lopez was trying to talk to the attendees. He was right behind them. And at one point, he was turned, and that's what the 13A and 13B shows. But he was right behind the Skid Row walk attendees. And he was the loudest and the most vocal at that point. And so that was right after the second warning where Lieutenant Paulson said, I'm going to be making an arrest. She gave that warning, and it went unheeded. The behavior was not changed. The conduct was not changed at all. Now, moving to the content-based arguments. Let's see. What appellants argue is that 403 is content-based because it has these exemptions in the statute. But an appellant doesn't specify what views or ideas are actually being suppressed or what the state is favoring or disfavoring. They're saying there's a different standard for those two exceptions. But those two exceptions don't involve the type of speech or content. It's not time, place, and manner, is it? Your Honor, none of these statutes, 403.302 or 183.40, they don't mention anything about subject matter or speech. Isn't one having something to do with the church or a religious gathering? Yes, 302, it's just – if the Court may have a moment. 302 is disturbing religious meetings, and it just states, every person who intentionally disturbs or disquiets any assemblage of people for religious worship. It doesn't have any type of subject matter or content-based anything in there. There's no speech or no expression or no idea that is actually being favored or disfavored in there. It's religious worship. Isn't that a kind of speech? Well, it's a type of meeting. So it's more of a location. If they're at a place where there is religious worship, it's not talking about what type of – if it said where only Jesus can be talked about or where the Koran is being read, then maybe perhaps that would have a subject matter. If ethical humanists had a meeting or the American Atheist Association had a meeting, you've got three statutes, and presumably their meeting is covered by one of the statutes, but will it be a different statute than 302? Which one would they be covered? Well, I guess if atheists are considered religious, I mean, I would assume that they would be under penal code section 403. They wouldn't fall under that. It depends. I mean, if they were – it depends on the location. That's the issue here. It's the location. If at a place of worship or at – it's a type of meeting. It's not the subject matter of the meeting. It's a type of meeting. So no speech has been singled out here. And appellate sites, city of Ladue – clearly in city of Ladue, there was an ordinance that banned signs. The political speech was exempted. They could only put up identification signs in the yard, and the plaintiff could not have political signs. So that was obviously a difference between political speech and nonpolitical speech. And in – Essentially what you're saying is those statutes define the audience, not the speaker. Correct. Correct. And it's curious as to how, you know, as far as 403, that's the statute under which Mr. White was arrested, and it does – it exempts 302 and 18340, but appellants are essentially making facial challenges to both of those other statutes. Well, the argument is that this statute is unconstitutional because it applies a different rule to this type of speech than is applied to the other type of speech. That's the argument. That is, when it speaks to disrupt a religious audience, you're tried under one type of statute. If it's speech to disrupt whatever this elector theory is, to that kind of speech, there's a different standard applied, and to 403, there's a third type of standard applied. So 403 is unconstitutional. I'm not sure it's a vagueness argument, but I think it's an argument applying different standards to different types of speech, speech designed to disrupt religious arguments, religious gatherings, speech designed to disrupt political gatherings, and speech designed to disrupt other kinds of gatherings. That's the argument. And it's looking at the kind of speech designed to disrupt audiences and the church audiences, and I don't know, maybe, for instance, the kind of demonstration outside the Democratic or Republican conventions, where you often have similar problems of where can you do it, what can you say. It's really not as unique a problem as it might be, but if I understand the argument correctly, that's the constitutional argument, that you have three different types of speech which leads you to the content argument, and they apply different standards to violations of those three types of speech. And, Your Honor, the city would respectfully disagree. The city would respectfully disagree. Those three statutes actually regulate the conduct. There's no speech in those statutes that is being singled out. The 302 talks about rude or indecent behavior. It doesn't talk about any – it's conduct. It doesn't talk about any particular speech. Is the same theory with respect to… 302. …to this case before us that doesn't involve speech? It's not a First Amendment problem? Oh, this case, yes, Your Honor, but I'm talking about the… But you said this is only conduct, it's not speech. Well, oh, as far as 403, the argument is, what the city is arguing, is that it only regulates conduct. It doesn't – none of these statutes regulate speech. It's only conduct. So it's okay to disrupt the church gathering by speaking and yelling or using – it's only if you do what? Hit them with an ax? No, but it's not what is being said that's being – It's not content-based. It's not content-based, yes. It's not content-based. It's only by the conduct. So no matter what they say, if they get up there and start screaming, it can be – it doesn't matter what's being said. It's the fact that they're screaming, their conduct. That's what's being penalized in 302. Is screaming conduct? It's behavior. It's not content. It doesn't – So speaking isn't conduct either? Well, it depends on what's being said. That's content. And so it doesn't matter at a religious meeting. It would matter if you – I understand that this – what's being said to one group is normally different than what's being said to another. If you go to the church and you say, we don't like Florida State, we're for Auburn, that would be highly unlikely. If you went to the church and you said, we don't approve of religious ceremonies, that you might find a normal place to do it. And the content of the speech in these three categories is likely to be quite different. But, Your Honor, it doesn't matter if someone goes – it doesn't matter what's said when they go to the house of worship or this place of worship. It doesn't matter what's said at a meeting. It doesn't matter. It matters how – the manner in which that speech or that content is expressed, not actually what is being expressed or – So the same thing would be true of abortion. If you go to an abortion clinic and they say, it's okay to go to any abortion clinic and speak, say whatever you want or do whatever you want, because that's one of the exceptions we're going to make. If you do this at an abortion clinic, if you speak in a disruptive manner at an abortion clinic, that's okay. But if you speak anywhere else in a disruptive manner, that's not okay. That wouldn't be a speech problem because you're only regulating conduct? Correct. Okay. All right. Well, you're only four minutes over, and that's very little compared to your opponent. You paid as much overtime. Hold on, hold on, hold on. So we don't want to cut you off or allow you to make your full argument. So if you have something more you want to tell us that's reasonably important, go ahead, but don't do too much. Also, Your Honor, if I wanted to just address the nature of the walk, because in Ray K., the court did limit Penal Code Section 403 to save it from being overbroad, and so the standard is substantially impairs the conduct of a meeting. The defendant has to substantially impair the conduct by intentionally committing acts in violation of implicit customs, and that the defendant should have known or did know what those customs are. And Pete White, he had attended the walk prior, a month prior to the walk, so he knew exactly what this walk entailed, and he knew it wasn't a protest. He knew that it wasn't a place for loud and ruckus noise and that it was a meeting. And multiple times, Lieutenant Paulson had invited the L.A. TAN members and Othello Lopez as well to come on the walk with them, and if they wanted to speak about their protest to the walk, they could do it in that manner at that time. There is one question I'd like to pose, and it relates a little bit back to what we were talking about before, but also to the vagueness argument. I look at these three statutes, and I'm not sure, I guess it's the election code provision that puzzles me. Why wouldn't that provision cover what was going on here, or let me put it better to you. What does that provision cover? What falls under the election code 18340 as opposed to the penal code 403? Well, it looks like 18340, it involves or it covers voters who are meeting to talk about perhaps a political question. The Skid Row walk would not fall under 18340 because it is by no means a political meeting at all. There might be politicians who are invited on the walk. Let's break it down. Are they electors? I'm sorry. Are the walk participants electors? They could be perhaps. I mean, who knows if they are registered voters, but perhaps, you know, I don't know. How do you ever know at a meeting whether everybody is a registered voter or an elector? I'm sorry. How do you know at any meeting whether someone or all of them are registered voters or electors? So what does that statute mean? From just the plain reading of the statute, it just looks like if electors or voters are assembling to discuss questions, political questions or questions having to do with the public. You didn't draft the statute. The statute, God knows how many hundred years ago, but it seems to me it encompasses just about everything unless you happen to have a non-citizen or a minor there that wouldn't qualify as an elector. A public meeting for the consideration of public questions is about as broad as I can imagine. And so one of the things I thought about, why isn't this covered by that provision? And it could make a difference because, as the plaintiffs argue, the standards are a little different there. The statute requires threats, intimidations or unlawful violence. Those provisions aren't in 403. And even if we would accept the disruption version of facts, that in fact the Skid Row walk had been disrupted, there would be a set of arguments with regard to whether the disruption that may have been accomplished was by threats, intimidation or unlawful violence. So my biggest problem on vagueness is trying to figure out, okay, we've got three statutes. They sort of cover the waterfront slightly different ways. I understand logically why 403 is written so it doesn't overlap with the others, but it makes it difficult for me to figure out where the boundary is, particularly between 403 and 18340. Where would you put the boundary? Well, I believe that, and I think that 403 probably is more general, whereas in reading California elections code, it comes from the elections code, and I mean both 403 and 18340 are misdemeanors. But it looks like, you know, in assembling public meetings for the consideration of public questions, that Skid Row walk meeting would not have fallen under that particular code section. It would have fallen, it would, just the nature of the meeting would fall more under 403 because it's also an assembly. You know, LA CAN had a problem, and on the video you heard them saying it's not a public meeting. So the Skid Row walk attendees, as they walk, it could be an assembly or a meeting. It seems like it's a little broader. It kind of encompasses a little more, maybe more meetings than just one that voters are assembling to consider questions of public questions. So, you know, the LAPD is probably more comfortable enforcing the penal code versus an elections code. And there wasn't an abuse, there hasn't been an abuse of enforcement here, Your Honors. In Lieutenant Paulson's declaration, SDR 19-24, she discusses how she's been a police officer for 20 years, and this is the first time she's ever made an arrest for 403. So she was using it in a very discriminant manner. She also stated on the videos earlier that day, the briefing, that this is not going to be, she didn't want it to be a mass arrest. She stated it's going to be methodical if we make the arrest, and it's going to be methodical, and we're going to peel somebody off one by one. So she did not want to make mass arrests. She just wanted to cure the problem, and the problem was that the Skid Row walk attendees could not conduct their meetings, and so she wanted to do it very methodically. She wasn't out there. The LAPD was not out there. They had never really had much of a presence at these meetings until L.A. County started protesting it, and they were invited guests, so maybe two officers would be out there, so that if there were any concerns that the LAPD needed to address, the officer was there. But until the protest started, they did not have much of a presence there, so that's why they've never really, they've never had a 403 arrest at this meeting, and she threatened it for four or five months. It never happened. They never changed their conduct, so this was kind of a last-ditch effort by her in order to maintain order on these walks. And, Your Honors, the city would just request that the court affirm the district court's judgment in granting the city's motion for summary judgment. Thank you very much. Thank you, counsel. We were asking for two minutes. I think I can do this in two minutes. First, Judge Clifton, let me return to the question you asked earlier about how many, how the court could rule based on one incident. In Center for Bioethical Reform v. Los Angeles Sheriff's Department, that's exactly what this court did. Judge Pragerson reviewed a California Penal Code statute that had been on the books a long time, and the Sheriff's Department used that statute to threaten arrest, detain, handcuff, search the van, of a group of anti-abortion demonstrators who were driving around the school with a big photograph of a fetus. And they violated an ordinance that prohibited disturbing a public school in various ways. The ordinance, the statute, clearly did not apply. But the court went farther than that. And the decision in Center for Bioethical Reform looked at the statute, held that the statute was unconstitutional, and then looked to see if it could save it. That particular statute had language that was codified in the enactment of the statute that said it did not intend to impinge on First Amendment freedoms. So this court construed it to mean that it could not be applied to any kind of speech activity in that instance. The court didn't say they only did it once, the people didn't even get prosecuted, they simply got detained and searched. The court didn't say any of that. The court said this statute sets a chill on protected speech, and so we are going to look at the constitutionality of it. Is there anything in the statute, the legislative history of the statute we're dealing with that says something similar here? No. I think this statute is meant to apply to speech. I think it's meant to apply to speech as well, Your Honor. But in Center for Bioethical Reform, the court had language that it could use to limit the reach of the statute and to make sure that it did not apply to any speech activity, any protected First Amendment activity. In Comité de Honorarios, my bad Spanish, the court couldn't find any language in the statute, and so the court struck the statute. This court did en banc. And there is no similar limiting language here because it is intended to. I want to, Judge Reinhart used the example of the abortion protest, but I think there's another really good example that illustrates the failure of this statute and why it can't be saved and why it should not be saved by this court. One of the most pressing political issues, social issues, economic issues facing this country is immigration reform. If a group of electors in California wanted to try to adopt legislation as had been adopted in Arizona, setting aside that a lot of it had been declared unconstitutional, but if they wanted to see if they could adopt legislation similar to that, anybody protesting that meeting would be protected unless they engaged in threats, intimidation, or violence, assuming that they're all electors. If, on the other hand, a group of dreamers comes together to talk about how they might propose legislation or executive action that President Obama could take to change their status, much like occurred in DACA, in the delayed action order from the President, if somebody wanted to protest that, they would not be given the same latitude that would be given if it were electors looking at that legislation. It makes no sense. They're talking about the same issue, but the difference there is the identity of the speaker and the fact that one is talking about potential electoral matters and the other is talking about perhaps getting an executive order that the President signs. And so that distinction can't stand in the law. But I think that the... Well, the executive order would still be a public question. But it would not be an election matter. It doesn't say election matter. It says, in public meetings for the consideration of public questions. That's what the election code says. I understand, but I think that the fact that it's in the election code would suggest to anybody reading it that it has to do with... President gets elected too. Not... The President gets elected, but that's not what the ordinance says. And if you're talking about DREAMers, who by definition are not citizens, there isn't going to be protection at that level anyway. And so this is an ordinance that makes no sense no matter how you look at it. It is a statute that simply can't be applied in any way. Well, the ordinance makes complete sense. The distinction between the election code, whatever the number is, and the penal code, written well before anybody was concerned about the things we're talking about here today, may be a tough one to defend. But frankly, I've got no problem with the sense of the statute. It is intended to permit public discourse by keeping other people from disrupting that discourse. And that's not inconsistent with the First Amendment. No, that's not inconsistent with the First Amendment. But if the standard in most instances, in Brandenburg and other cases, is threat, intimidation, and violence, then it is inconsistent in some ways with it. And the question is, can it be applied consistent with the First Amendment as it is written? And the answer is no. And the city said, you know, in the city's argument, they said the city considered and told people they were going to enforce this for months before they finally made arrests. But that doesn't mean that they don't have an intent to go back to it. That doesn't mean that they don't see it as a primary enforcement tool. And that certainly doesn't mean that this ordinance gives any person of reasonable intelligence an adequate understanding of what conduct is prohibited and what conduct is permitted. And that's the cardinal rule of the First Amendment protects. Thank you. We even made two minutes turn into four and a half. Too bad we don't have loaves of bread. All right. Thank you both. Good evening. And the court will now stand and recess for the day.
judges: Dorsey, Reinhardt, Clifton